

# ARKANSAS COURT OF APPEALS

DIVISION II
**No.** CV–16–989

|  |  |
|---|---|
| SHARON K. BARTON, ROBERT FRANKLIN BRYANT, GALLIE THOMAS BRYANT, AND FRANCES PAULETTE BRYANT<br><br>APPELLANTS<br><br>V.<br><br>BOBBY AND SHEILA BROCKINTON<br><br>APPELLEES | **Opinion Delivered** June 7, 2017<br><br>APPEAL FROM THE FAULKNER COUNTY CIRCUIT COURT [NO. 23CV-12-721]<br><br>HONORABLE H.G. FOSTER, JUDGE<br><br>AFFIRMED |

## BRANDON J. HARRISON, Judge

Sharon K. Barton, Robert Franklin Bryant, Gallie Thomas Bryant, and Frances Paulette Bryant (the Bryants) and Bobby and Sheila Brockinton (the Brockintons) are adjacent landowners in a boundary-line dispute in Faulkner County. A previous final-order issue has been resolved, so the merit of the circuit court's decision is now before us.

I.

In 2012, the Bryants sued the Brockintons, alleging that they had destroyed a fence, trespassed, and built three storage units on the Bryants' property. The Bryants asked for $40,000 in damages and for the court to eject the Brockintons from their property. The circuit court held a two-day bench trial in April 2014 and then entered judgment for the Brockintons. The Bryants' first point on appeal is that the court erred in accepting the

Brockintons' proposed boundary line. The testimony of three surveyors—James Ross and Scott Foster for the Bryants and Tim Tyler for the Brockintons—is particularly important to the decision. Though much of the long testimony is not entirely clear, here is a summary of the surveyors' opinions on the boundary-line question.

A. James Ross

James Ross testified that he performed a survey for the Bryants in the mid-to-late 1990s (in section 7) and that he also did a survey in 1992 for the Revis property in section 18. Ross used a monument he found one mile south to establish the range line[1] in the southeast quarter of section 18. He also established "the next corner up," which was the corner directly north along the range line. He agreed that the range line he established in 1992 (the "Ross survey") was also the boundary line of the Bryant property. According to Ross, "In this case, the west [boundary] line of the Bryant property is a range line. That [range] line is supposed to be straight for six miles. It is not supposed to bend for six miles." He agreed that the line had been established "before the Brockintons [sic] got involved or there was any development in [the] area."

Ross further testified that he again ascertained the disputed boundary line in 2009 (when he did a survey for the Bryants) by establishing the range line using the same section corner as he did in the 1990s. Ross testified that the corner was "in the middle of [highway 36]" and that it "just takes 15 minutes maybe to shoot that to recheck that." The corner

---

[1]The term "range" has been defined this way: "[i]n U.S. government surveys, a strip of public land running due north to south, consisting of a row of townships, at six-mile intervals." *Black's Law Dictionary* (10th ed. 2014), Westlaw (current through the 10th edition).

"establishes the same range line running in a north/south direction that is this border of the entire Bryant property."

Ross conducted a third survey dated 18 August 2011, at the Bryants' request, and it showed that two of the Brockintons' storage buildings and part of a third building were located east of the range line (the property boundary), according to Ross. This survey was admitted as Plaintiff's Exhibit 6. Ross confirmed that it was "the same range line two times done before."

A line drawn on the Ross survey (Plaintiff's Exhibit 6) is labeled the "Tyler Line." The southernmost point on the "Tyler Line" is labeled "PK Nail" and next to it is an arrow with these words: "Tyler used this point as being the SE Corner SE 1/4–SE 1/4 Section 12, T–60N R–12–W." Ross described the PK nail shown on the Ross survey as "a little magnetic nail about the size of your thumb." He said that it was a type of monument or landmark that is normally found in survey work and that he found the PK nail when he did the previous two surveys. Ross concluded that the PK nail was too far to the east because its location did not fit with the other established corners or reference marks. He explained that, in Arkansas, the point of origination for all surveys is where the mouth of the Arkansas River and the St. Francis River intersect, having been established following the Louisiana Purchase. (This origination point is at the Fifth Principal Meridian.) He also testified that the range line he established lines up with the original range lines established in the Louisiana Purchase.

According to Ross, his range line was accurate because "You can't just find some corner and say that's it. You better check with other corners to make sure everything's in

accordance." In Ross's opinion, the property line in Tyler's survey could not be supported and was not correct because it could not be tied in to other corners and monuments like his range line could.

On cross-examination, Ross agreed that prior to 1992 he had not surveyed an area using this range line. He could not say whether prior surveyors used what he considered to be the correct range line or whether they had used the PK nail. Ross agreed that a surveyor would yield to courses and distances in prior survey work if "there are accepted corners," but he did not agree that the PK nail was an accepted corner on the range line before he conducted his first survey in the 1990s. Even if the PK nail was an accepted monument "for years prior to the early '90s," Ross said that he would not have to yield to it because it did not align with "established and accepted corners." When asked, "Back to original land patents and surveys, you cannot say whether or not that this PK nail was utilized for the range lines, can you?" he answered, "Possibly I cannot." Ross nonetheless denied that the PK nail was a correct monument to use to establish the range line.

On redirect, Ross agreed that the range lines were established in the 1800s, that they were fixed, and that they cannot be changed. And "going all directions, I can't find anything else but what I've got."

On recross-examination, Ross agreed that he would probably yield if "no one else has ever utilized the range line and everybody's utilized the PK nail even though incorrect." He could not say that the Tyler line was established in litigation in 1999. Ross agreed that there was an older fence along the Tyler line when Ross had conducted his first survey.



On further redirect examination, Ross confirmed that "this is a well-established range line—established many, many, many years ago" and that his location of the range line was the correct one.

## B. Scott Foster

Professional land surveyor Scott Foster testified next. He was hired by the Bryants "to verify the range line which was established by either Mr. Ross or Mr. Tyler to verify which one was correct." Foster explained that he reviewed Ross's surveys, Tyler's surveys, and surveys done by the state highway department. Foster traced and retraced numerous corners using the rules established by the Bureau of Land Management to locate the proper location for the range line, according to the GLO (General Land Office) maps or the original surveys that were done in the 1830s. He concluded that the range line "was more in line of where the Ross survey showed it to be." He said that he did not know how or why Mr. Earnhart (Tyler's predecessor) or Tyler's line "jogged over to the east" and that range lines cannot be altered in their direction; they could not be altered to go east or west.

Foster explained that the PK nail Tyler based his survey on was "27 feet and some change east of where the range line truly is." When asked if the PK nail had any significance as a monument or landmark, Foster said:

> [I]t's obviously, a monument because it's referenced in a survey, Mr. Earnhart's survey. Right or wrong . . . It could be a traveler's point. It could be a property corner. It could be intended to be anything. If it's called to be on the range line, it's not.

He explained that the state highway department had to establish the range line in order to do the "right of way taking off the new highway." In his words, "They have the potential for taking people's property so they do a very thorough job." Foster said that the



highway department's range line was the same range line that he had established and that it was the correct one. Here is how he explained his method:

> When we ran this line [the Ross line] as I mentioned earlier, from the—the point at the south, which was accepted, we then went east and west in both directions as a check. *That's not proper methodology for reestablishing a range line* but it gives me some ability to check and see if it's here or if it's 27 feet to the east. We went east for two miles. We found corners, brought 'em back in, proportioned 'em out by the GLO. They were within feet. We went to the west and did the same thing and came back in this direction. We were within a couple of feet, actually we were less than a foot, coming from this direction. That is overwhelming evidence to me that the line should be where we have it in a straight line.

(Emphasis added.) When asked, "The original established range line?" Foster replied, "Yes, sir."

## C. Tim Tyler

Surveyor Tim Tyler, who testified for the Brockintons, said that he performed a survey for Bobby Brockinton in May 2011 but revised it in July 2011. The Tyler survey was admitted as Defendant's Exhibit 2. Tyler also did a survey in 1998. Tyler agreed that his north/south line was approximately 27 feet east of Ross's line. Tyler's survey notes that Ross's line was established in 1996. Tyler also referenced a survey his father did in 1994, one Earnhart did in 1998, and a Ross survey from 1994. Tyler said he used the PK nail to establish the range line (the "Tyler line"). According to Tyler, Earnhart noted on his survey that Ross had used the PK nail in 1990, though Tyler did not have a copy of the 1990 Ross survey. When questioned by the court whether Ross used the PK nail in his 1990 and 1994 surveys, Tyler responded that he "[could not] say it was a PK nail then" but that Ross had used the same point then that Tyler had used in this case.

Tyler stated that he had a 1986 survey by Earnhart showing a corner where the PK nail was located calling it "final iron pin." In Tyler's words, "It's the exact same corner—southwest corner [sic] of Section 12." Tyler possessed an old book by B.F. Stermer, the county land surveyor in the early 1900s. Tyler said that he and his father used this book and the note references from 1902 to 1910. According to Tyler, he and his father did a survey in 1991 that referenced the same corner as "being on the range line, there's jogged corners." He also said that he did not know whether it was the true range line.

Tyler's corner was the northeast corner of section 13, where that PK nail is, but "back then" it was an iron pin (section 13 is in the Range 12 West township but abuts section 7 in the Range 11 West township). He said the "jogged corners as you go up through there" were based on Stermer's notes from the early 1900s. Relying on those notes, Tyler said that the GLO notes from when the original surveys were done in the 1850s and 1860s were on file with the state and that Stermer had set the corners based on the GLO notes. In other words, according to Tyler, county surveyor Stermer used GLO notes to derive the mark that is now the PK nail. Tyler said that Stermer must have set the location of the PK nail before 1960.

Tyler also testified that he and his father had used the same PK nail corner—the northeast corner of section 13 and the southeast corner of section 12—in 1985. Tyler said his field notes show an IP (iron pin) and show a "jog of 56 feet and 10-56 foot and tenth jog there that goes back further west or east." According to him, no survey before Ross's 1996 survey used the range line Ross had marked. In Tyler's view, Stermer's notes from the early 1900s established the Tyler line as the range line.

Here is a colloquy that occurred on cross-examination:

BRYANTS' ATTORNEY:   Let's talk a little bit about the course of surveying, you, -you know, it's been educational because you said you don't know if the Ross line is the correct range line or not because that's not what matters, right?

TYLER:   I can't say that that's what matters. I can't say that it's the correct line or not. What we based our line off of is previous surveys that had been established prior to when we surveyed. Also, previous notes from earlier surveyors like such as Mr. Stermer, such as Mr. Ross, such as Mr. Earnhart and accepted monuments in the area. We did not break the whole section down and re-establish the range line. It was done in the 1800's. You can go back and re-establish the range line again if you want to. I have no-I have no reason to think that it might move further west. I'm not sure of that but that's not my call. I can't-I can't say that it is or it ain't. I'm just going based upon accepted land surveys and notes previously.

When asked about Foster's testimony that the PK nail location hadn't been used prior to Earnhart's survey, Tyler responded that many surveys were never filed in the courthouse and the lack of filing does not destroy the survey's legality.

Tyler testified that he was the Faulkner County surveyor, and when questioned whether he was "asked to do a survey and that survey implicated this range line, if you were asked to do it; would you find the corner to be the same corner where the PK nail is located presently," he replied, "I can't say for sure. If you ask me to–to establish the range line." He also testified that he would place the Tyler line along the PK nail based on the previous surveys and notes; he confirmed that to be an accepted practice, but acknowledged that the ultimate call was to be done by "the man in the robe." Tyler also recognized the possibility that the Ross line could be the original range line. And he admitted that he did not check

his line from different directions; he based his line off a corner that had been established in previous surveys.

## II.

The Bryants' first point specifically argues that the circuit court's finding that they failed "in their burden to establish by a preponderance of the evidence that the boundary line they claimed between the parties' property was the true boundary" is clearly erroneous. In their view, the circuit court erred when it relied on Tyler's survey because it was drawn from an incorrect starting point—the PK nail in the road. In other words, Tyler's survey method was clearly wrong. The Brockintons responded, "The decision is no longer whether the Ross survey or the Tyler survey is better; the decision on appeal is whether the choice of the Tyler survey was clear error . . . . This entire [case] may be as simple as the trial court disregarding Ross's testimony because it thought he was being untruthful."

### A. Boundary-Line Law

The Bryants had the burden to prove the location of the boundary line by a preponderance of the evidence. *See Mason v. Peck*, 239 Ark. 208, 210, 388 S.W.2d 84, 85 (1965) (burden of proof). We do not disturb a circuit court's findings of fact in a boundary case unless they are against the preponderance of the evidence. *Id. See also* Ark. R. Civ. P 52(a) (2016) (A circuit court's fact findings during a bench trial "shall not be set aside unless clearly erroneous (clearly against the preponderance of the evidence.)"). A finding is clearly erroneous when, "although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed." *Id.*

The Brockintons own the land west of Range 11 and the Bryants own the land to the east in this dispute. Range lines are set by the public land survey system and cannot be changed by landowners, surveyors, or the courts. *See* Walter G. Robillar & Lane J. Bouman, *Clark on Surveying and Boundaries* § 21.08, at 683 (7th ed 1997). If a private survey conflicts with the one made by the government when the patents and grants were originally issued, preference must be given to those made by the government. *Morrow v. White*, 12 Ark. App. 16, 19, 670 S.W.2d 459, 461. New surveys cannot affect valid, bona fide private property rights acquired under old surveys. *See Mo. Pac. R.R. Co. v. Sale*, 197 Ark. 1111, 114–15, 127 S.W.2d 133, 135 (1939). Regarding the significance of GLO surveys and any subsequent resurveys, this court has written:

> At the time of the Louisiana Purchase this area was a vast wilderness, sparsely populated and with no integrated system of land descriptions. Early in the nineteenth century Congress authorized the General Land Office to survey and plat the entire area in order to give each parcel of land in the public domain a specific and identifiable location which would be subject to relocation by survey at any time. The field notes and plats of those surveys are carefully preserved and with few exceptions all lands in this area were disposed of by the Federal Government with reference to these surveys. Due to errors which were bound to occur, these surveys did not always result in perfect square mile sections of 640 acres with parallel boundaries. Survey parties did not always meet at the point previously calculated and some of the established section corners did not coincide with adjoining ones.

> These approved GLO surveys formed the basis for the description of lands when disposed of by the government and any errors, including variances from prescribed courses, distances of acreages, were merged into the government grants. A patent or other original conveyance made with reference to a subdivision conveyed those lands which the General Land Office Plat showed it to contain. The purpose of subsequent surveys in locating corners and boundaries is not to correct any error or variance of the original surveyor but is to retrace his steps by use of his field notes and plats and to locate the corners where he located them.

SLIP OPINION

*Brann v. Hulett*, 2013 Ark. App. 687, at 6 (internal citations omitted).

To prevent the public-land-survey boundary lines from changing, an Arkansas county surveyor is required to keep a record book of his surveys' original 1800s surveyors' field notes that are used to locate the original corners or boundary markers and those records are available to the public. Ark. Code Ann. § 14-15-709 (Repl. 2013); Ark. Code Ann. §§ 22-5-701, -703, -704 & -709 (Repl. 2016). A certified copy of the county surveyor's record constitutes prima facie evidence in any court of record in this state. Ark. Code Ann. § 14-15-712. The Arkansas Supreme Court has held that certified copies of the original surveys and field notes are weighty evidence of a legal boundary. *See Russell v. State*, 97 Ark. 92, 133 S.W. 188 (1910) (criminal case of a defendant stealing and killing a sheep; question was whether killing occurred in Arkansas or Missouri).

The location of a boundary line is usually a question of fact. *Jennings v. Burford*, 60 Ark. App. 27, 32, 958 S.W.2d 12, 15 (1997). A survey is not color of title but is just one form of evidence for a court to consider when determining a legal boundary. *See Brann v. Hulett*, 2013 Ark. App. 687.

### B. The Circuit Court Was Not Clearly Wrong

In this case no party introduced certified copies of original surveys, field notes, or a certified copy of the county surveyor's record. And as we mentioned earlier, no party's surveyor claimed to mark the Range 11 West line using an established method for reestablishing range lines. James Ross could not say, "back to original land patents and surveys", whether the PK nail (Tyler's line) was used for the range line. True, Ross checked his work by using two section corners that were one mile north and south of where he

established his starting point (the southwest corner of the SW 1/4-SW 1/4 of section 7 Township 6 North, Range 11 West) to say that his line was the true range line. Scott Foster did more by going in four directions—north, south, east, and west—to check whether Ross's line or Tyler's line was correct. But Foster admitted that it was "not [a] proper methodology for reestablishing a range line[.]" Tim Tyler said that he did not reestablish the range line either or know where it was. So no witness conclusively established the original range line according to the original federal patents and survey notes. There was some testimony from Foster that he had found the corners according to the GLO maps or the original surveys done in the 1830s; and Tyler said that he used a corner that had been established from the GLO maps and original field notes. In other words, all three surveyors drew the line based on what they contended were undisputed points in space (known corners).

Under the law, the circuit court is required to credit a survey that relies on GLO methods and practices over one that doesn't. *See Brann*, 2013 Ark. App. 687. But that is not the case here because the two competing boundary lines (the Ross/Foster line and the Tyler line) were drawn by surveyors who all claim to have based their methods and practices on GLO principles. As it stands, this case falls into the general category of when we defer to the circuit court's determination of the credibility of competing surveys. *Watkins v. Paragould Light & Water Comm'n*, 2016 Ark. App. 432, 504 S.W.3d 606. In this situation, we will not reverse the circuit court's judgment for the Brockintons. "Where there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous." *Rymor Builders, Inc. v. Tanglewood Plumbing Co.*, 100 Ark. App. 141, 147, 265

S.W.3d 151, 155 (2007) (citing *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985)). Given the deferential standard of review and the so-called "dueling experts," we affirm the circuit court's conclusion that the Tyler survey was the closest approximation to the original range line and was therefore the boundary line.

## III.

For their second point on appeal, the Bryants argue that the Brockintons failed to call Tim Tyler's predecessors (Tyler's father and Earnhart) as witnesses who could have purportedly shown that the PK nail was used in the past. They argue that the circuit court should have drawn an adverse inference from this omission. A fact-finder may draw an adverse inference when there is identified relevant evidence in the possession of a party in whose interest it is to produce it and who fails to do so without satisfactory explanation. *Slaughter v. Capitol Supply Co.*, 2009 Ark. 221, at 8, 306 S.W.3d 432, 437. But there is no inference on appeal that the testimony of a witness under the control of a party would be unfavorable to that party when the witness is not present at the trial and is not called to testify. *Jones v. Brown*, 242 Ark. 537, 540, 414 S.W.2d 618, 620 (1967) (question for the jury). We do not reweigh the evidence here, meaning we do not credit or discredit the parties' decisions to call or not call witnesses. *Id.* We therefore decline to favor the Bryants' second point on appeal.

For their third point the Bryants argue that the court erred in excluding a diary of a deceased family member. We need not go into detail on this point because the diary was offered to show that the Brockintons had notice of the boundary dispute and that the Bryants claimed ownership of the property. The circuit court determined that the Brockintons were

the legal owners of the property according to the Tyler survey, and we affirm that determination. Because we have affirmed the circuit court's boundary-line decision, we do not need to decide whether the court abused its discretion in excluding the diary because that issue was relevant to counter the Brockintons' claims of adverse possession and boundary by acquiescence.

Affirmed.

VAUGHT and BROWN, JJ., agree.

*C. James Kubicek* and *Robert S. Tschiemer*, for appellants.

*Greg Crumpton, P.A.*, by: *Greg Crumpton*; and *Wilson & Haubert, PLLC*, by: *Stefan K. McBride*, for appellees.